No. 20-50407

# In the United States Court of Appeals for the Fifth Circuit

TEXAS DEMOCRATIC PARTY, GILBERT HINOJOSA, CHAIR OF THE
TEXAS DEMOCRATIC PARTY, JOSEPH DANIEL CASCINO, SHANDA
MARIE SANSING, AND BRENDA LI GARCIA,

*Plaintiffs-Appellees,*

*v.*

GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS,
RUTH HUGHS, TEXAS SECRETARY OF STATE, KEN PAXTON,
TEXAS ATTORNEY GENERAL,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## BRIEF FOR DEFENDANTS-APPELLANTS

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant
  Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

KYLE D. HAWKINS
Solicitor General
Kyle.Hawkins@oag.texas.gov

LANORA C. PETTIT
Assistant Solicitor General

Counsel for Defendants-Appellants

# Certificate of Interested Persons

No. 20-50407

Texas Democratic Party, Gilbert Hinojosa, Chair of the Texas Democratic Party, Joseph Daniel Cascino, Shanda Marie Sansing, and Brenda Li Garcia,

*Plaintiffs-Appellees,*

*v.*

Greg Abbott, Governor of Texas, Ruth Hughs, Texas Secretary of State, Ken Paxton, Attorney General of Texas,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Kyle D. Hawkins
Kyle D. Hawkins
*Counsel of Record for*
*Defendants-Appellants*

i

## Statement Regarding Oral Argument

This case merits oral argument. The U.S. Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) (citing *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 135 S. Ct. 9 (2014); *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). Nevertheless, in the middle of a hotly contested election cycle—and just weeks before a primary runoff—the district court issued a sweeping injunction that upended the rules regarding mail-in ballots that Texas's Legislature has carefully crafted over decades. Counsel for Plaintiffs have acknowledged elsewhere that this is a "first-of-its kind lawsuit to compel the [S]tate to provide its voters with relatively unrestricted vote-by-mail."[1] Defendants suggest that oral argument will help the Court in deciding the numerous legal issues it raises.

---

[1] Chad W. Dunn, et al., *Legal Theories to Compel Vote-by-Mail in Federal Court*, 11 Cal. L. Rev. Online 166, 167 (2020); *see also id.* at 177 ("The authors welcome others to contact UCLA Voting Rights Project with possible additional theories.").

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................i

Statement Regarding Oral Argument ........................................................ii

Table of Authorities .................................................................................v

Introduction............................................................................................. 1

Statement of Jurisdiction ......................................................................... 2

Issues Presented ...................................................................................... 2

Statement of the Case .............................................................................. 3

     A.  Voting by Mail in Texas ......................................................... 3

     B.  State Officials Work Tirelessly to Make In-Person Voting Safe........... 5

     C.  Plaintiffs Pursue Unsuccessful Claims in State Court........................ 7

     D.  This Duplicative Litigation .................................................... 9

Summary of the Argument...................................................................... 12

Standard of Review ................................................................................ 14

Argument.............................................................................................. 14

    I.  Because Defendants Do Not Enforce the Challenged Laws, the Temporary Injunction Exceeds the Court's Jurisdiction......................... 15

     A.  Sovereign immunity bars Plaintiffs' claims........................ 15

     B.  Plaintiffs lack standing to sue Defendants ......................... 19

     C.  *Pullman* required the district court to abstain .................................... 23

    II.  Plaintiffs Are Not Likely to Show a Constitutional Right to Vote by Mail........................................................................................24

     A.  Texas's mail-in ballot rules easily pass the applicable rational-basis test........................................................................... 25

     B.  Plaintiffs' claim fails even under the *Anderson/Burdick* test. .............. 33

    III.  The Texas Supreme Court Has Now Confirmed that Plaintiffs Cannot Succeed on their Remaining Claims. ........................................40

     A.  Plaintiffs will not succeed on their void-for-vagueness claim .............40

     B.  Plaintiffs will not succeed in showing the Texas Attorney General engaged in voter intimidation.................................................42

     C.  Plaintiffs will not succeed on their free-speech claims ...................... 45

IV.  The Remaining Preliminary-Injunction Factors Favor Defendants .......... 47

Conclusion ........................................................................................... 48

Certificate of Service ............................................................................ 49

Certificate of Compliance ..................................................................... 49

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Abbott v. Perez,*
 138 S. Ct. 2305 (2018) ....................................................................... 5

*Air Evac EMS v. Tex. Dep't of Ins.,*
 851 F.3d 507 (5th Cir. 2017) .............................................. 16, 18, 19

*Alexander v. Sandoval,*
 532 U.S. 275 (2001)........................................................................ 44

*Anderson v. Celebrezze,*
 460 U.S. 780 (1983) ........................................................... 33, 37, 38

*Armour v. City of Indianapolis,*
 566 U.S. 673 (2012)........................................................................ 30

*Ass'n for Retarded Citizens of Dall. v.*
 *Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trs.,*
 19 F.3d 241 (5th Cir. 1994) ............................................................ 21

*Atwater v. Lago Vista,*
 532 U.S. 318 (2001)........................................................................ 31

*Baker v. Carr,*
 369 U.S. 186 (1962) .................................................................. 35, 36

*Ballas v. Symm,*
 351 F. Supp. 876 (S.D. Tex. 1972),
 *aff'd,* 494 F.2d 1167 (5th Cir. 1974) ............................................. 17

*Barber v. Bryant,*
 860 F.3d 345 (5th Cir. 2017).......................................................... 20

*Benningfield v. City of Houston,*
 157 F.3d 369 (5th Cir. 1998) ......................................................... 43

*Bond v. Floyd,*
 385 U.S. 116 (1966) ....................................................................... 46

*Box v. Planned Parenthood of Ind. & Ky., Inc.,*
 139 S. Ct. 1780 (2019) ................................................................... 31

*Brushaber v. Union Pac. R.R.,*
 240 U.S. 1 (1916)............................................................................ 28

*Bullock v. Calvert,*
 480 S.W.2d 367 (Tex. 1972)........................................................... 18

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ................................................................*passim*
*Bush v. Gore*,
  531 U.S. 98 (2000) ................................................................ 27, 38
*Cantu v. Moody*,
  933 F.3d 414 (5th Cir. 2019) ..................................................... 42, 44
*City of Austin v. Paxton*,
  943 F.3d 993 (5th Cir. 2019) ....................................................*passim*
*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................ 23
*Clingman v. Beaver*,
  544 U.S. 581 (2005) ................................................................ 33
*Coal. For Good Governance v. Raffensperger*,
  No. 1:20-cv-1677-TCB,
  2020 WL 2509092 (N.D. Ga May 14, 2020) ...................................... 20, 34, 36
*Colo. Project-Common Cause v. Anderson*,
  495 P.2d 220 (Colo. 1972) ...........................................................30
*Colson v. Grohman*,
  174 F.3d 498 (5th Cir. 1999) ........................................................ 46
*Cox v. Louisiana*,
  379 U.S. 559 (1965) ................................................................ 46
*Crawford v. Marion Cty. Elec. Bd.*,
  553 U.S. 181 (2008) ................................................................ 27, 38
*Delancey v. City of Austin*,
  570 F.3d 590 (5th Cir. 2009) ........................................................44
*Dennis Melancon, Inc. v. City of New Orleans*,
  703 F.3d 262 (5th Cir. 2012) ........................................................ 14
*Dep't of Homeland Sec. v. Thuraissigiam*,
  No. 19-161, 2020 WL 3454809 (U.S. June 25, 2020) ...............................28
*Deubert v. Gulf Stream Fed. Sav. Bank*,
  820 F.2d 757 (5th Cir. 1987) ........................................................ 43
*Eisner v. Macomber*,
  252 U.S. 189 (1920)................................................................28
*Elec. Privacy Info. Ctr. v.*
  *Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ................................................... 22, 23

*Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) ............................................................ 17

*Epps v. Fowler*,
351 S.W.3d 862 (Tex. 2011) ............................................................. 24

*Eu v. S.F. Cty. Democratic Cent. Comm.*,
489 U.S. 214 (1989) ......................................................................... 34

*Ex parte Young*,
209 U.S. 123 (1908) ....................................................................*passim*

*F.C.C. v. Beach Commc'ns Inc.*,
508 U.S. 307 (1993) ......................................................................... 31

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv. LLC*,
140 S. Ct. 1649 (2020) ..................................................................... 32

*Fitzgerald v. Racing Ass'n of Cent. Iowa*,
539 U.S. 103 (2003) ......................................................................... 31

*Ford Motor Co. v. Tex. DOT*,
264 F.3d 493 (5th Cir. 2001) ............................................................ 41

*Fox v. Washington*,
236 U.S. 273 (1915) ......................................................................... 46

*Frank v. Walker*,
574 U.S. 929 (2014) ........................................................................... ii

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
695 F.3d 330 (5th Cir. 2012) ............................................................ 21

*Gentile v. State Bar of Nev.*,
501 U.S. 1030 (1991) ....................................................................... 42

*Goosby v. Osser*,
409 U.S. 512 (1973) ......................................................................... 26

*Griffin v. Roupas*,
385 F.3d 1128 (7th Cir. 2009) .......................................................... 38

*Groome Res. Ltd. v. Par. of Jefferson*,
234 F.3d 192 (5th Cir. 2000) ............................................................ 41

*Gross v. German Found. Indus. Initiative*,
456 F.3d 363 (3d Cir. 2006) ............................................................. 36

*Harris v. Wilters*,
596 F.2d 678 (5th Cir. 1979) ............................................................ 14

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ......................................................................... 22

*Heller v. Doe ex rel. Doe*,
 509 U.S. 312 (1993) ...................................................................... 30
*Hilliard v. Ferguson*,
 30 F.3d 649 (5th Cir. 1994) ..................................................... 42, 43
*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977) ...................................................................... 21
*In re Abbott*,
 954 F.3d 772 (5th Cir. 2020) .........................................................2
*In re Bass*,
 171 F.3d 1016 (5th Cir. 1999) ...................................................... 14
*In re Stalder*,
 540 S.W.3d 215 (Tex. App.—Hous. [1st Dist.] 2018, no pet.) .......... 17
*In re State of Texas*,
 No. 20-0394, 2020 WL 2759629 (Tex. May 27, 2020) .............................*passim*
*In re Volkswagen AG*,
 371 F.3d 201 (5th Cir. 2004) .................................................. 39, 47
*Jacobson v. Fla. Sec'y of State*,
 957 F.3d 1193 (11th Cir. 2020) ............................................... 18, 36
*Jacobson v. Massachusetts*,
 197 U.S. 11 (1905) ..........................................................................5
*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
 478 U.S. 221 (1986) ...................................................................... 34
*Jolicoeur v. Mihaly*,
 488 P.2d 1 (Cal. 1971) .................................................................. 30
*Justin Indus. Inc. v. Chocktaw Sec. L.P.*,
 920 F.2d 262 (5th Cir. 1990) ........................................................ 14
*K.P. v. LeBlanc*,
 627 F.3d 115 (5th Cir. 2010) .....................................................16, 18
*Kimel v. Fla. Bd. of Regents*,
 528 U.S. 62 (2000) ........................................................................ 27
*Kollender v. Lawson*,
 461 U.S. 352 (1983) ..................................................................40-41
*Kramer v. Union Free Sch. Dist. No. 15*,
 395 U.S. 621 (1969) ...................................................................... 26
*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
 624 F.3d 1083 (9th Cir. 2010) .................................................22-23

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) ............................................................... 36

*Lee v. Va. State Bd. of Elections*,
  843 F.3d 592 (4th Cir. 2016) ............................................................... 33

*Lewis v. Gov. of Ala.*,
  944 F.3d 1287 (11th Cir. 2019) (en banc) ........................................... 20

*Logan v. U.S. Bank N.A.*,
  722 F.3d 1163 (9th Cir. 2013) ............................................................. 44

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................... 20, 22

*Maryland v. King*,
  122 S. Ct. 1 (2012) ............................................................................. 47

*Matsushita Elec. Indus. Co. v. Epstein*,
  516 U.S. 367 (1996) ........................................................................... 24

*Mays v. La Rose*,
  951 F.3d 775 (6th Cir. 2020) ............................................................... 27

*McDonald v. Bd. of Election Comm'rs of Chi.*,
  394 U.S. 802 (1969) ...................................................................*passim*

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
  501 U.S. 252 (1991) ........................................................................... 47

*Meyers v. Roberts*,
  246 N.W.2d 186 (Minn. 1976) ............................................................ 29

*Moore v. La. Bd. of Elementary & Secondary Educ.*,
  743 F.3d 959 (5th Cir. 2014) ............................................................... 15

*Morris v. Livingston*,
  739 F.3d 740 (5th Cir. 2014) ............................................................... 16

*Munaf v. Geren*,
  553 U.S. 674 (2008) ........................................................................... 14

*NAACP v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) ....................................................21, 22, 23

*Nashville Student Organizing Committee v. Hargett*,
  155 F.Supp.3d 749 (M.D. Tenn.2015) ................................................. 29

*Nautilus Ins. Co. v. Int'l House of Pancakes, Inc.*,
  622 F. Supp. 2d 470 (S.D. Tex. 2009) ................................................. 41

*NiGen Biotech, L.L.C. v. Paxton*,
  804 F.3d 389 (5th Cir. 2015) ............................................................... 19

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992).................................................................. 32

*O'Brien v. Skinner*,
   414 U.S. 524 (1974)............................................................. 26

*O'Caña v. Salinas*,
   No. 13-18-00563-CV, 2019 WL 1414021 (Tex. App.—Corpus
   Christi-Edinburg Mar. 29, 2019, pet. denied).................................. 38

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ................................................. 18

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) ....................................... 15, 16, 18, 20

*Olsen v. DEA*,
   878 F.2d 1458 (D.C. Cir. 1989) ............................................... 39

*Pennhurst State Sch. v. Halderman*,
   465 U.S. 89 (1984) ............................................................ 15

*Pittsburg Press Co. v. Pittsburg Comm'n on Human Relations*,
   413 U.S. 376 (1973) .......................................................... 46

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006).........................................................*passim*

*R.R. Comm'n of Tex. v. Pullman Co.*,
   312 U.S. 496 (1941) ....................................................... 23-24

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   140 S. Ct. 1205 (2020) .................................................... ii, 35

*Roberts v. La. Downs, Inc.*,
   742 F.2d 221 (5th Cir. 1984)................................................. 34

*Rucho v. Common Cause*,
   139 S. Ct. 2484 (2019)............................................... 34-35, 36, 37

*Russell v. Lundergan-Grimes*,
   784 F.3d 1037 (6th Cir. 2015) ............................................... 19

*Sessions v. Dimaya*,
   138 S. Ct. 1204 (2018) ...................................................... 41

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017)..................................................... 39, 40

*S. Bay United Pentecostal Church v. Newsom*,
   140 S. Ct. 1613 (2020) ..................................................... 2, 5

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
    632 F.3d 938 (5th Cir. 2011) ....................................................... 34, 35

*Spencer v. Bd. of Educ. of Schenectady*,
    291 N.E.2d 585 (N.Y. 1972) ............................................................. 29

*Spencer v. Hughes Watters Askanse, LLP*,
    No. 5:15-CV-00233, 2015 WL 3507117 (W.D. Tex. June 3, 2015).....................24

*Stansberg v. Holmes*,
    613 F.3d 1285 (5th Cir. 1989) ........................................................... 41

*Storer v. Brown*,
    415 U.S. 724 (1974) .......................................................................... 48

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .......................................................................... 21

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .......................................................................... 19

*Tex. Indigenous Council v. Simpkins*,
    No. SA–11–cv–315–XR, 2014 WL 252024 (W.D. Tex. Jan. 22, 2014) .............. 21

*Texas Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ....................................................*passim*

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ........................................................... 47

*Thole v. U.S. Bank N.A.*,
    140 S. Ct. 1615 (2020) ..................................................................... 17

*Thompson v. Dewine*,
    959 F.3d 804 (6th Cir. 2020)............................................................20

*Thornhill v. Alabama*,
    310 U.S. 88 (1940) ........................................................................... 46

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ......................................................................... 33

*Town of Chester v. Laroe Estates*,
    137 S. Ct. 1645 (2017)......................................................................20

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014)..................................................................... 28, 31

*United States v. Clinical Leasing Servs., Inc.*,
    925 F.2d 120 (5th Cir. 1991) ........................................................... 41

*United States v. Henderson*,
    636 F.3d 713 (5th Cir. 2011) ........................................................... 14

*United States v. McLeod,*
    385 F.2d 734 (5th Cir. 1967) ........................................................... 45

*United States v. Texas,*
    445 F. Supp. 1245 (S.D. Tex. 1978),
    *aff'd sub nom. Symm v. United States,* 439 U.S. 1105 (1979) ........................ 29, 30

*United States v. Williams,*
    553 U.S. 285 (2008) ...................................................................13, 45

*United States R.R. Ret. Bd. v. Fritz,*
    449 U.S. 166 (1980) ......................................................................32

*United Tribe of Shawnee Indians v. United States,*
    253 F.3d 543 (10th Cir. 2001) ...........................................................18

*Va. Office for Prot. & Advocacy v. Stewart,*
    563 U.S. 247 (2011) ......................................................................15

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016).............................................. 1, 36-37, 38

*Veasey v. Abbott,*
    870 F.3d 387 (5th Cir. 2017) .............................................................47

*Veasey v. Perry,*
    135 S. Ct. 9 (2014) ........................................................................ii

*Vieth v. Jubelirer,*
    541 U.S. 267 (2004) ......................................................................36

*Walgren v. Bd. of Selectmen of Town of Amherst,*
    519 F.2d 1364 (1st Cir. 1975) ...........................................................30

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ......................................................................30

*Willingham v. Cty. of Albany,*
    No. 04-369, 2005 WL 1660114 (N.D.N.Y. July 12, 2005)................................45

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ........................................................................47

*Zapata v. Smith,*
    437 F.2d 1024 (5th Cir. 1971) ..................................................... 17-18

*Ziglar v. Abassi,*
    131 S. Ct. 1843 (2017) ...................................................................44

## Constitutional Provisions, Statutes and Rules:

U.S. Const.:

    art. I, § 4, cl. 1 ....................................................................... 35

    art. I, § 9, cl. 2 ....................................................................... 28

    art. III ....................................................... 12, 19, 22, 23

    amend. I ........................................................................ *passim*

    amend. XIV ........................................................... 10, 24, 27

    amend. XXVI ............................................................... *passim*

28 U.S.C.:

    § 1292(a)(1) ........................................................................... 2

    § 1331 ..................................................................................... 2

42 U.S.C. § 1985(3) ............................................................... 42

52 U.S.C.:

    §§ 10301 *et seq.* ................................................................ 18

    § 10307(b) .................................................... 42, 44, 45

    § 10308(d) ......................................................................... 44

Ind. Code § 3-11-10-24(a)(5) ........................................... 31

Ky. Rev. Stat § 117.085(a)(8) .......................................... 31

La. Stat. § 18:1303(J) ....................................................... 31

Miss. Code § 23-1415-715(b) .......................................... 31

Tenn. Code § 2-6-201(5)(A) ........................................ 31-32

Tex. Elec. Code:

    ch. 64 ..................................................................................... 3

    ch. 64, subch. B .................................................................. 37

    ch. 87 ................................................................................... 37

    §§ 82.001-.004 ..................................................................... 4

    § 82.002 ...................................................................... 13, 41

    § 82.002(a) ..................................................................... 4, 9

    § 82.003 .............................................................................. 31

    § 82.005 ................................................................................. 3

    §§ 83.002-.005 ..................................................................... 4

    § 84.001(d) ........................................................................... 4

    § 84.0041 .................................................................... 13, 46

    § 86.001 .............................................................................. 17

Tex. Elec. Code:
    §§ 86.001(a)-(c) .................................................................5
    § 86.006(a) ........................................................................5
    §§ 87.001, *et seq.* .............................................................5
    § 273.061........................................................................12, 18
    § 276.013........................................................................ 13, 46

Tex. Gov't Code:
    §§ 402.042-.043 ............................................................. 43
    §§ 418.001, *et seq.*..........................................................5

Act of May 26, 1917, 35 Leg., 1st C.S., ch. 40, 1917
    Tex. Gen. Laws 62. In 1935 ............................................3

Act of May 30, 1975, 64th Leg. R.S., ch. 682, § 5, 1975
    Tex. Gen. Laws 2080, 2082 ........................................ 4, 31

Act of October 30, 1935, 44th Leg., 2nd C.S. ch. 437, § 1, 1935
    Tex. Gen. Laws, 1700, 1700-01 ......................................3

Tex. R. App. 29.1(b) ..............................................................8

## Other Authorities:

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of*
    *Legal Texts* (2012) ........................................................28

Chad W. Dunn, et al., *Legal Theories to Compel Vote-by-Mail in Federal*
    *Court*, 11 Cal. L. Rev. Online 166 (2020) ...................... ii, 36

*David Wildstein*, Evidence of Massive Voter Fraud in Paterson
    Election, Court Records Show, N.J. Globe (June 14, 2020),
    https://newjerseyglobe.com/local/evidence-of-massive-voter-
    fraud-in-paterson-election-court-records-show/ ............................. 37

Eric S. Fish, Note, *The Twenty-Sixth Amendment Enforcement Power*,
    121 Yale L.J. 1168 (2012) ...............................................28

*Gilberto Hinojosa & Associates: Attorney at Law*, http://ghinojosalaw.net/
    ghinojosalaw/home.html (last visited June 23, 2020)......................22

H.J. of Tex., 64th Leg., R.S. 4204 (1975) ..............................................4

House Comm. On Elections, Bill Analysis, S.B. 1047, 64th Leg., R.S. (1975),
    https://lrl.texas.gov/LASDOCS/64R/SB1047/SB1047_64R.pdf#page=82......4

Michael King, *Paxton Threatens Election Officials with Prosecution*, Austin Chron. (May 4, 2020), https://www.austinchronicle.com/daily/news/ 2020-05-04/paxton-threatens-election-officials-with-prosecution/ ...................8

Michael T. Morley, *Election Emergencies: Voting in the Wake of Natural Disasters and Terrorist Attacks*, 67 Emory L.J. 545 (2018) ........................... 33, 34

National Conference of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail, and Other Voting at Home Options, Qualifying for an Absentee Ballot* (June 9, 2020), https://www.ncsl.org/research/elections -and-campaigns/ absentee-and-early-voting.aspx.............................................. 31

Notice of Nonsuit, *Tex. Democratic Party v. Debeauvoir*, D-1-GN-20-001610 (Travis County Dist. Ct. June 9, 2020)..............................9

*Party Affiliation on the First Day of the Legislative Session*, Legislative Reference Library of Texas, https://lrl.texas.gov/legeLeaders/ members/partyList.cfm (last visited June 25, 2020) .........................................32

*Records of the Federal Convention of 1787* (M. Farrand, ed., 1966) ...........................35

Reply to Respondents' Opposition to the Application to Vacate the Fifth Circuit Stay, *Tex. Democratic Party v. Abbott*, No. 19A1055, 2020 WL 3478784 (U.S. June 26, 2020) .........................................27

S.J. of Tex. 64th Leg., R.S. (1975) ..........................................................4

S. Rep. No. 92-26 (1971) ..........................................................29

Tessa Weinberg, *Paxton Warns Local Officials Against Encouraging Vote-by-Mail Due to Coronavirus Fears*, Fort Worth Star-Telegram (May 1, 2020)..........8

Tex. Gov. Proclamation (Mar. 18, 2020 10:00 a.m.), https://gov.texas.gov/uploads/files/press/PROC_COVID-19_May_2_Election_Date_IMAGE_03-18-2020.pdf ................................5, 30

Tex. S. Con. Res. 65, 62d Leg., R.S., 1971 Tex. Gen. Laws 3867 ............................4

*Texas Coronavirus Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/texas-coronavirus-cases.html (last updated June 26, 2020) .......................................39

Texas Health and Human Services, *Long Term Care*, https://hhs.texas.gov/services/aging/long-term-care.......................................31

Texas Secretary of State, *Election Advisory No. 2020-12 Actions for May 2, 2020 Uniform Election Date* (March 18, 2020), https://www.sos.state.tx.us/elections/laws/advisory2020-12.shtml ........................................................................................... 6

Texas Secretary of State, *Election Advisory No. 2020-19, Voting In Person During COVID-19* (June 18, 2020), https://www.sos.texas.gov/elections/laws/advisory2020-19.shtml .................. 7

Texas Secretary of State, *Health Protocols for Voters*, https://www.sos.texas.gov/elections/forms/health-protocols-for-voters.pdf ........................................................................................... 6

The Federalist No. 37 (James Madison) (Clinton Rossiter, ed., 1961) .................. 41

### Introduction

Texas law generally requires eligible voters to vote by personal appearance at a designated polling place. The Texas Legislature's preference for in-person voting is among the State's many policies protecting the integrity of elections. The Legislature has determined that other forms of voting, including mail-in ballots, should be limited because in-person voting is the surest way to prevent voter fraud and guarantee that every voter is who he claims to be. *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (en banc) ("[T]he potential and reality of fraud is much greater in the mail-in-ballot context than with in-person voting.").

Nevertheless, the district court below issued a preliminary injunction requiring Texas officials to disregard the Legislature's policy choice mere weeks before an election and days before mail-in ballots began to be distributed to eligible voters. To the district court, the emergence of a global pandemic provides sufficient policy justification to override the Texas Legislature's anti-fraud measures and grant every voter in Texas the unalienable right to vote by mail. Relying on "the Declaration of Independence, the Gettysburg Address, the Bible, and various poems," the district court, "order[ed] that '[a]ny eligible Texas voter who seeks to vote by mail in order to avoid transmission'" of COVID-19 may do so. *Texas Democratic Party v. Abbott*, 961 F.3d 389, 395 (5th Cir. 2020) (*TDP*). Moreover, the court forbade Defendants from issuing guidance about the meaning of state law. ROA.2121.

The district court's order either ignores or misapplies decades of precedent about the limits of federal jurisdiction and the constitutional status of mail-in voting. Because of its myriad legal errors and because the injunction irreparably harms

Defendants, this Court issued a published opinion staying the injunction pending appeal. The Court should now reverse the district court's order and vacate the injunction. Plaintiffs' claims fail at the outset because Defendants do not enforce the laws whose enforcement Plaintiffs seek to enjoin. As there is no constitutional right to vote by mail, Plaintiffs are not likely to succeed on their constitutional claims. Moreover, any impediment to Plaintiffs' right to vote comes from a virus that operates independently of Defendants' control. The district court erroneously turned the fundamentally political question of what precautions are "enough" to protect voters against that virus into a constitutional claim.

This Court should vacate the injunction in recognition that while the appropriate response to this pandemic is "subject to reasonable disagreement," local officials must be allowed space to "shap[e] their response to changing facts on the ground." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613, 1614 (2020) (Roberts, C.J., concurring in denial of injunctive relief); *see also In re Abbott*, 954 F.3d 772, 783-85 (5th Cir. 2020).

## Statement of Jurisdiction

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. The Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## Issues Presented

1. Whether federal courts have jurisdiction to enjoin the enforcement of a statute that Defendants do not enforce.

2.  Whether Plaintiffs have established a likelihood of success on their claim that Texas's mail-in-ballot rules abridge their right to vote.

3.  Whether Plaintiffs are likely to succeed on their claims that:

    a.  The definition of "disability" in the Texas Election Code, as interpreted by the Texas Supreme Court, is impermissibly vague;

    b.  Plaintiffs have a constitutionally protected right to encourage ineligible voters to vote by mail; and

    c.  The Attorney General conspired with his own staff to intimidate voters by correctly explaining state law to election officials.

4.  Whether the remaining stay factors favor Defendants.

## Statement of the Case

### A.  Voting by Mail in Texas

For more than a century, Texas law has required most voters to cast their ballots in person, either on election day, Tex. Elec. Code ch. 64, or during an early-voting period prescribed by the Legislature, *id.* § 82.005. The only exceptions are for voters who face unique hardships in going to the polls. In 1917, the Legislature passed the first absentee voting law to allow qualified voters who expected to be away from their jurisdictions on election day to vote. Act of May 26, 1917, 35 Leg., 1st C.S., ch. 40, 1917 Tex. Gen. Laws 62. In 1935, the Legislature extended absentee voting to the ill and physically disabled. Act of October 30, 1935, 44th Leg., 2nd C.S. ch. 437, § 1, 1935 Tex. Gen. Laws, 1700, 1700-01.

In 1975, the Legislature "extended absentee voting to voters 65 years of age or older." *In re State of Texas*, 2020 WL 2759629, at *8 (Tex. May 27, 2020) (*Texas*) (citing Act of May 30, 1975, 64th Leg. R.S., ch. 682, § 5, 1975 Tex. Gen. Laws 2080, 2082). This was part of a significant revision of the Election Code passed after Texas (among other States) ratified the Twenty-Sixth Amendment.[2] One purpose of these revisions was "to bring the Texas Election Code into conformity with" with the Twenty-Sixth Amendment.[3] The Legislature adopted this bill, which both lowered the voting age to 18 *and* allowed all voters over 65 to vote by mail, by an overwhelming majority.[4]

Texas currently allows voters to vote by mail if they (1) anticipate being absent from their county of residence; (2) are sick or disabled; (3) are 65 or older; or (4) are confined to jail. Tex. Elec. Code §§ 82.001-.004. The "disability" category allows a voter to vote by mail if he "has a sickness or physical condition that prevents the voter from appearing at the polling place on election day without a likelihood . . . of injuring the voter's health." *Id.* § 82.002(a).

A voter who wants to vote by mail must apply "to the early voting clerk" in "the election precinct of the applicant's residence." *Id.* § 84.001(d). Depending on the type of election, that early-voting clerk is either a county or city employee. *Id.* §§ 83.002-.005. The early-voting clerk "review[s] each application for a ballot to be

---

[2] Tex. S. Con. Res. 65, 62d Leg., R.S., 1971 Tex. Gen. Laws 3867.

[3] House Comm. On Elections, Bill Analysis, S.B. 1047, 64th Leg., R.S. (1975), https://lrl.texas.gov/LASDOCS/64R/SB1047/SB1047_64R.pdf#page=82.

[4] H.J. of Tex., 64th Leg., R.S. 4204 (1975); S.J. of Tex. 64th Leg., R.S. (1975).

voted by mail" and either "provide[s]" a ballot or rejects the application. *Id.* §§ 86.001(a)-(c). Once a voter has completed a mail-in ballot, it is returned to the early-voting clerk. *Id.* § 86.006(a). The local early-voting-ballot board then processes and counts (or rejects) the mail-in ballot. *Id.* §§ 87.001, *et seq.* Though the Secretary may provide guidance in this process, neither she nor any other Defendant has authority to process mail-in ballots or applications.

## B. State Officials Work Tirelessly to Make In-Person Voting Safe.

Our federal system gives state officials the primary role in protecting the health and safety of Texans. *Newsom*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). It likewise places primary responsibility on state officials to conduct elections—a duty courts presume is discharged in good faith. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). To accomplish both those ends, state officials are assiduously monitoring COVID-19. On March 13, 2020, Governor Abbott exercised his statutory power under the Texas Disaster Act, Tex. Gov't Code §§ 418.001, *et seq.*, and declared a state of disaster in all of Texas's 254 counties. ROA.990-92. Since the disaster declaration, state officials have adopted multiple measures to protect—among many other things—the uniformity and integrity of elections.

The Governor has used his authority to delay, or allow municipalities to delay, elections that were scheduled during May. ROA.1049-50; Tex. Gov. Proclamation (Mar. 18, 2020 10:00 a.m.), https://gov.texas.gov/uploads/files/press/ PROC_COVID-19_May_2_Election_Date_IMAGE_03-18-2020.pdf. This includes postponing a May primary runoff to July 14. ROA.1003-04. More recently,

the Governor issued a proclamation doubling the time available for early voting for the July 14 primary. ROA.562-63. This will reduce lines and crowds while allowing the State to protect the integrity of the election. ROA.562.

The Secretary of State has issued several advisories, including a March 18 advisory urging local officials to exercise their authority to postpone elections scheduled for May 2, 2020.[5] Most, but not all, localities followed this advice. Since then, the Secretary has continued to act to ensure that elections are run safely, including promptly alerting local election officials that the Governor's May 11 proclamation gives them "flexibility to offer voters extended early voting hours." ROA.565. She has further explained that Texas would receive $24.5 million in federal funds to "prevent, prepare for, and respond to [the] coronavirus . . . for the 2020 Federal election cycle," which would be subgranted to Texas counties. ROA.565.

On May 26, 2020, the Secretary issued detailed guidance to voters and election officials in consultation with the Texas Department of State Health Services. Texas Secretary of State, *Health Protocols for Voters*, https://www.sos.texas.gov/elections/forms/health-protocols-for-voters.pdf. Voters are being encouraged to self-screen for the symptoms of COVID-19. *Id.* at 2. Those with symptoms are encouraged to contact election officials regarding arrangements to use curbside voting or vote a late ballot. *Id.* Voters are also encouraged to wear face coverings, disinfect their hands, and bring their own means of marking the ballot. *Id.* at 2-3. Election

---

[5] Texas Secretary of State, *Election Advisory No. 2020-12 Actions for May 2, 2020 Uniform Election Date* (March 18, 2020), https://www.sos.state.tx.us/elections/laws/advisory2020-12.shtml.

officials are, in turn, urged to take numerous steps to encourage social distancing and proper hygiene, including arranging voting booths farther apart, disinfecting commonly touched surfaces frequently, and providing voters with means to disinfect their hands. *Id.* at 7-8. Heavily trafficked polling locations are to consider "a polling place worker wholly or partially dedicated to ensuring the recommended health protocols are successfully implemented and followed." *Id.* at 8.

On June 18, the Secretary supplemented these protocols with additional guidance regarding (among other things) the spacing and cleaning of voting equipment, providing protective equipment to poll workers and voters, and handling voters who appear to display symptoms of COVID-19. Texas Secretary of State, *Election Advisory No. 2020-19, Voting In Person During COVID-19* (June 18, 2020), https://www.sos.texas.gov/elections/laws/advisory2020-19.shtml. In this advisory, the Secretary reiterated that her "primary concern is the health and safety of voters, election workers, and local election officials and their staff." *Id.*

## C.  Plaintiffs Pursue Unsuccessful Claims in State Court.

In March, several organizations and a handful of voters, including Plaintiffs, filed a lawsuit against the Travis County Clerk, aimed at allowing all Texans to vote by mail.[6] They asked the state court to declare that "any eligible voter, regardless of age and physical condition," may vote by mail "if they believe they should practice social distancing in order to hinder the known or unknown spread of a virus or disease."

---

[6] Brenda Li Garcia was not a named plaintiff in the state-court action, but TDP sued on behalf, and as a representative of, its members. ROA.306. TDP asserted that Garcia is a member to establish standing here. ROA.961.

*See* ROA.41. The clerk did not oppose the plaintiffs' request, and the State intervened to defend Texas law. The state trial court entered an injunction prohibiting any state official, including Defendants, from "taking actions . . . that would prohibit individuals from submitting mail ballots based on the disability category" during the pandemic. ROA.1905. The State immediately filed a notice of interlocutory appeal, which superseded and stayed the state court's order. Tex. R. App. 29.1(b); *Texas*, 2020 WL 2759629, at *3.

Despite the stay, Plaintiffs acted as if the state-court injunction remained in effect. Indeed, the Texas Democratic Party's (TDP) Primary Director testified that TDP expended considerable resources engaging in unspecified "voter contact methodologies" and "supporting voters who are planning to vote-by-mail." ROA.1611-12. TDP and its counsel also engaged in a media blitz to convince the public that the injunction remained in force.[7]

In response to the "public confusion" caused by the state-court action and Plaintiffs' conduct, the Attorney General provided guidance to county election officials, explaining that "[b]ased on the plain language of the relevant statutory text, fear of contracting COVID-19 unaccompanied by a qualifying sickness or physical

---

[7] Michael King, *Paxton Threatens Election Officials with Prosecution*, Austin Chron. (May 4, 2020), https://www.austinchronicle.com/daily/news/2020-05-04/paxton-threatens-election-officials-with-prosecution/ ("Dunn also rejected Paxton's assertion that District Judge Sulak's order is 'stayed' pending appeal."); Tessa Weinberg, *Paxton Warns Local Officials Against Encouraging Vote-by-Mail Due to Coronavirus Fears*, Fort Worth Star-Telegram (May 1, 2020), https://www.star-telegram.com/news/politics-government/article242443406.html (substantively same).

condition does not constitute a disability under the Texas Election Code." ROA.857. Moreover, he explained, "advis[ing] voters to apply for a ballot by mail for reasons not authorized by the Election Code" could subject "third parties to criminal sanctions." ROA.858. But, he explicitly stated, "whether specific activity constitutes an offense . . . will depend upon the facts and circumstances of each individual case." ROA.858. Finally, he explained that the then-stayed state-court injunction "does not change or suspend these requirements." ROA.858.

Because confusion continued to spread, the State petitioned the Texas Supreme Court for a writ of mandamus on May 13, 2020, to compel five county clerks to abide by the language of the Election Code. ROA.1830-59. On May 27, the Supreme Court held "that a lack of immunity to COVID-19 is not itself a 'physical condition' that renders a voter eligible to vote by mail within the meaning of § 82.002(a)." *Texas*, 2020 WL 2759629, at *11. It declined to issue a writ of mandamus because the Court was "[c]onfident that election officials will comply." *Id*.

After the Texas Supreme Court's ruling conclusively resolved the merits of their state-court case, Plaintiffs dismissed that suit with prejudice on June 9. Notice of Nonsuit, *Tex. Democratic Party v. Debeauvoir*, D-1-GN-20-001610 (Travis County Dist. Ct.).

## D.  This Duplicative Litigation

Hedging against such an unfavorable outcome in state court, Plaintiffs filed this action on April 7 but delayed serving Defendants until well after the state-court

injunction was entered.[8] ROA.8. Seeking a preliminary injunction, they asserted that the State's articulation of the plain text of its Election Code violates the First, Fourteenth, and Twenty-Sixth Amendment (as-applied), and that it is void for vagueness. ROA.112-18, 122-25, 127-28.[9] And they accused the Attorney General of voter intimidation and suppressing political speech. ROA.117-22, 125-27. Plaintiffs sought relief indistinguishable from what they were ultimately denied in state court. *Compare* ROA.1904-05, *with* ROA.2028-29. Much of Plaintiffs' evidence is duplicative of that offered in state court. *Cf.* ROA.918-20 (distinguishing state-court exhibits from "other"). As Plaintiffs' witnesses admitted in state court, this evidence generally does not account for measures taken by Defendants to ensure that Texas elections are safe. *E.g.*, ROA.225, 228-29, 250-53.

By contrast, the State offered evidence that the specific steps taken to protect in-person voting in Texas can and will work. For example, Collin County's early-voting clerk explained that, even before the Secretary's most recent guidance, his jurisdiction would (among other things):

- Train election workers to set up polling locations to allow for social distancing;
- Provide Plexiglas shields and masks to protect poll workers;
- Provide sanitizing wipes and hand sanitizer to each location;
- Provide social distancing floor decals;

---

[8] The Governor still has not been served.

[9] The complaint also asserts facial challenges and claims of race-based discrimination, but Plaintiffs did not seek preliminary relief on those grounds. ROA.2153-54.

- Offer cotton swabs as disposable styli to mark ballots; and
- Utilize additional staff to ensure that these measures are implemented safely.

ROA.572-73. Other counties are taking similar precautions. ROA.574.

The State also offered the expert testimony of a Professor of Medicine and Public Health at UCLA with 520 peer-reviewed publications regarding infectious-disease prevention, an award from the CDC for contributions to public health, and experience both as a Medical Director in a COVID-19 laboratory and a volunteer poll-worker in Los Angeles County, ROA.567-68, 571. He concluded that the State's precautions are "reasonable and effective measures to reduce the likelihood of exposure to Covid-19 for voters and poll workers." ROA.571. Moreover, the evidence shows that similar measures were highly effective in preventing an outbreak following Wisconsin's April election, which may have seen as few as 19 cases of transmission among approximately 300,000 in-person voters. ROA.571; ROA.595-621 (finding "no detectable spike" in infections following election); ROA.607 (finding that "the average daily rate of new COVID-19 cases for Wisconsin was 3.65 before the election, and 3.23 for the 10-day incubation period following the election").

On May 19, the district court issued a 74-page opinion and order requiring no-excuse-mail-in balloting in Texas. ROA.2057-130. Unable to discredit the State's evidence, the court largely disregarded it. The court also ignored that the Supreme Court of Texas was to hear argument on the question within hours and declared that the term "disability," as defined in the Election Code, describes all Texans. ROA.2064. Then, citing *Poor Richard's Almanac*, the court ordered that "[a]ny

11

eligible Texas voter who seeks to vote by mail in order to avoid transmission of COVID-19 can apply for, receive, and cast an absentee ballot in upcoming elections during the pendency of pandemic circumstances." ROA.2065-66 & n.22. The court further enjoined Defendants from "issuing any guidance, pronouncements, threats of criminal prosecution or orders, or otherwise taking any actions inconsistent with this Order." ROA.2067.

## Summary of the Argument

**I.** The Court should reverse the order below and vacate the preliminary injunction for multiple independent reasons. First, Plaintiffs cannot overcome sovereign immunity or establish standing because—as the procedural history that led to the Texas Supreme Court's decision amply demonstrates—Defendants do not enforce the challenged provisions of the Election Code. This Court has recently emphasized that to enjoin a state official, a plaintiff must show both that the official "*has the authority to enforce*" the challenged statute and that she is "likely to do [so] here." *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). It is precisely because Defendants do *not* enforce the Election Code that Texas had to seek the extraordinary relief of a writ of mandamus "to compel the performance of [county election officials'] dut[ies]." Tex. Elec. Code § 273.061. And Plaintiffs do not allege that any Defendant is likely to—or even could—bring an enforcement action against them in particular. Without a realistic threat of enforcement *against Plaintiffs*, Plaintiffs can neither overcome sovereign immunity nor establish Article III standing.

**II.** Plaintiffs similarly fail to establish a likelihood of success—or even a justiciable question—on their claimed right to a mail-in ballot. It is settled that the

Constitution does not guarantee a right to vote by mail. *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). Because mail-in ballots are constitutionally gratuitous, States need only a rational basis for any eligibility criteria. *Id.* Texas's decision to limit mail-in voting to populations facing unique impediments to voting in-person is more than justified by its interests in deterring voter fraud and preserving efficient, orderly election administration. Any additional burdens imposed by COVID-19 cannot establish a constitutional claim because they not chargeable to the State. Moreover, whether the State has taken "enough" precautions to protect voters is a non-justiciable political question. Finally, even if the line Texas has drawn is unlawful, the remedy is to extend the general rule—in-person voting—not to expand the supposedly unconstitutional mail-in ballot exception to all voters.

**III.** Plaintiffs' remaining three claims will also fail, particularly in light of the Texas Supreme Court's decision. *First*, to the extent there was any doubt that the definition of "disability" in section 82.002 is sufficiently clear to satisfy due process (there was not), the Texas Supreme Court has resolved that doubt. *Second*, Plaintiffs' First Amendment claims are premised on an asserted right to encourage voters who lack immunity to COVID-19 to apply to vote by mail based on "disability." *See* ROA.93. The Texas Supreme Court confirmed that such voters are not ipso facto eligible to vote by mail, and encouraging voters who are not eligible to apply to vote by mail is a crime. Tex. Elec. Code §§ 84.0041, 276.013. The First Amendment does not protect the right to advocate or engage in criminal activity. *United States v. Williams*, 553 U.S. 285, 298 (2008). *Third*, Plaintiffs' claim that the Attorney General engaged in unlawful voter intimidation fails under this Court's precedent for many

reasons, not least that the Attorney General cannot (as he is alleged to do) conspire with his own staff.

## Standard of Review

This Court reviews questions implicating federal jurisdiction de novo, *e.g.*, *In re Bass*, 171 F.3d 1016, 1021 (5th Cir. 1999), and reviews the grant of a preliminary injunction for abuse of discretion. A decision based on legal error or clearly erroneous assessment of the evidence is an abuse of discretion. *United States v. Henderson*, 636 F.3d 713, 717 (5th Cir. 2011) (per curiam); *Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) (per curiam).

## Argument

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (quotation marks omitted). A movant must show: "(1) irreparable injury[,] (2) substantial likelihood of success on the merits, (3) a favorable balance of hardships, and (4) no adverse effect on the public interest." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (alterations in original). A preliminary injunction "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* Because Plaintiffs have sought a mandatory injunction, their burden is higher than if they had simply sought to preserve the status quo. *See, e.g.*, *Justin Indus. Inc. v. Choctaw Sec. L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (per curiam); *Harris*, 596 F.2d at 680 ("Only in rare instances is the issuance of a mandatory preliminary injunction proper.").

The district court erred in entering a preliminary injunction because Plaintiffs failed to establish federal jurisdiction, let alone a clear entitlement to relief.

## I. Because Defendants Do Not Enforce the Challenged Laws, the Temporary Injunction Exceeds the Court's Jurisdiction.

### A. Sovereign immunity bars Plaintiffs' claims.

"Federal courts are without jurisdiction over suits against a [S]tate, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). Plaintiffs acknowledged that *Ex parte Young* is their only route around sovereign immunity. ROA.956-58. *Ex parte Young*, however, "rests on the premise—less delicately called a fiction—that when a federal court commands a state official to do nothing more than refrain from violating a federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted).

The preliminary injunction must be vacated because Plaintiffs do not allege a "sufficient connection between the defendant state officials and the challenged statute" to invoke *Ex parte Young*. *Okpalobi v. Foster*, 244 F.3d 405, 415 (5th Cir. 2001) (en banc) (plurality). As an initial matter, to fit within this limited doctrine, a plaintiff must allege an ongoing violation of *federal* law. *City of Austin*, 943 F.3d at 1001-02. Federal courts lack jurisdiction to declare the content of and command compliance with state law. *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 92 (1984). To the extent the district court purported to enforce state law (ROA.2064), its order must be vacated.

More generally, Plaintiffs' claims fail because they impermissibly rely on Defendants' generalized duties (and willingness) to enforce Texas law. Although it would be a "convenient way for obtaining a speedy judicial determination of questions of constitutional law" to allow a plaintiff to sue an official because he *might* enforce state law, *Ex parte Young* recognized that such convenience would be fundamentally at odds with our federal system. 209 U.S. 123, 157 (1908). Instead, the named defendant must have both "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (adopting *Okpalobi* plurality). Moreover, generalized willingness to enforce the law is insufficient; Plaintiffs must show that Defendants are "likely to do [so] here." *City of Austin*, 943 F.3d at 1002. Plaintiffs failed to meet that burden as to the three Defendants.

**1.** The Governor lacks authority to "enforce" Texas's mail-in ballot rules. This Court has defined the term "enforce" in this context to involve "compulsion or constraint." *K.P. v. LeBlanc*, 627 F.3d 115, 124-25 (5th Cir. 2010); *see also Air Evac EMS v. Tex. Dep't of Ins.*, 851 F.3d 507, 519 (5th Cir. 2017). To enjoin the Governor, Plaintiffs must show he has "t[aken] an active role" in compelling their compliance with the Election Code, either by bringing an enforcement action or by actively administering the system on a day-to-day basis. *K.P.*, 627 F.3d at 124-25. The record shows only that the Governor suspended certain timing-related provisions of the Election Code in light of COVID-19. ROA.958. Those laws, however, addressed "*when* an election was to be held, not *how* it was to be conducted." *TDP*, 961 F.3d at 400 (citing

16

*Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020)). And none of the Governor's actions constrains Plaintiffs' ability to apply for a mail-in ballot. *Id.*[10]

**2.** The Secretary cannot constrain Plaintiffs—or anyone else—from voting by mail. Instead, under the Election Code's plain text, only local early-voting clerks "review each application for a ballot to be voted by mail" and either "provide" a ballot or "reject the application." Tex. Elec. Code § 86.001; *see also Texas*, 2020 WL 2759629, at *10-11 (discussing role of early-voting clerks). And the Secretary cannot compel local officials to review mail-in-ballot applications in any particular way. *In re Stalder*, 540 S.W.3d 215, 218 n.9 (Tex. App.—Hous. [1st Dist.] 2018, no pet.); *Ballas v. Symm*, 351 F. Supp. 876, 888 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974) ("Plaintiff admits that the Secretary's opinions are unenforceable at law and are not binding."). Indeed, it was the Secretary's *inability* to compel clerks to act that necessitated the State's petition for a writ of mandamus in the Texas Supreme Court against five county election officials.

Moreover, even if the Secretary could compel local action, a federal court cannot order her to do so. Any enforcement action by the Secretary would be affirmative action taken in her official capacity. It is well-established in this Circuit that *Ex parte Young* does not extend to "cases where the [defendant] could satisfy the court['s] decree only by [affirmatively] acting in an official capacity"; rather, it applies only where defendants can be ordered *to stop* actions violating federal law. *Zapata v. Smith*,

---

[10] The district court also lacked jurisdiction to enjoin the Governor because the Governor has not been served. *Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 470-71 (5th Cir. 1985).

437 F.2d 1024, 1026 (5th Cir. 1971); *accord Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1211-12 (11th Cir. 2020); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 548 (10th Cir. 2001).

Plaintiffs cannot point to any action by the Secretary that could be enjoined via a prohibitory injunction. Instead, they point to her title as chief election officer and this Court's decision in *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017). *E.g.*, ROA.956. The title is, however, not a "delegation of authority to care for any breakdown in the election process." *Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex. 1972). And *OCA-Greater Houston* involved a claim under the Voting Rights Act for which the Court concluded Congress had "validly abrogated state sovereign immunity." 867 F.3d at 614. The Court therefore had no reason to discuss *Ex parte Young's* exception to sovereign immunity. It did hold that those plaintiffs had *standing* to sue the Secretary on a facial challenge to a provision in the Election Code based on certain guidance she had given to local officials. *Id.* at 612-13. But that is an analytically distinct question from whether she enforces the law within the meaning of *Ex parte Young. City of Austin*, 943 F.3d at 1002-03. She does not.[11]

**3.** Plaintiffs' showing as to the Attorney General is similarly deficient. Recognizing that he has no ongoing role in administering the Election Code similar to those that allowed federal jurisdiction in *K.P.* and *Air Evacuation*, Plaintiffs focus instead

---

[11] *OCA-Greater Houston*'s standing analysis is also distinguishable because it turned on the plaintiffs' assertion of (1) a facial challenge (2) for which no private right of action is available. 867 F.3d at 613 (distinguishing *Okpalobi*). Neither is the case here. ROA.2153-54; Tex. Elec. Code § 273.061.

on the Attorney General's ability (shared with local prosecutors) to prosecute election fraud and two letters explaining the content of state law. ROA.332, 957. The existence of prosecutorial authority is insufficient to invoke *Ex parte Young*. *City of Austin*, 943 F.3d at 1002. While this Court has recognized that a specific threat can satisfy *Ex parte Young*, it has done so only when the alleged threat "intimat[ed] that formal enforcement was on the horizon" based on a specific wrongdoer's conduct. *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392 (5th Cir. 2015). Plaintiffs have pointed to no such specific threat, only letters that the Attorney General sent to a state legislator and state election officials noting that election fraud can carry criminal penalties. ROA.957. Unlike the letter at issue in *NiGen*, the Attorney General's letters do not reflect any conclusion about anyone's conduct. 804 F.3d at 392. To the contrary, they disclaim any such conclusions. *See* ROA.336, 858. Consequently, the letters do no more to constrain Plaintiffs' conduct than the existence of the Election Code itself. That is insufficient to support federal jurisdiction. *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (discussing indicia of enforcement).

## B.  Plaintiffs lack standing to sue Defendants.

For similar reasons, Plaintiffs cannot establish standing. As this Court has recognized, its "Article III . . . and *Ex parte Young* analysis 'significantly overlap,'" particularly in the pre-enforcement context. *City of Austin*, 943 F.3d at 1002 (quoting *Air Evac*, 851 F.3d at 520). Both require a determination "that an official *can* act" and a "significant possibility that he or she *will* act to harm [the] plaintiff." *Id.* (emphasis added) (citing *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015)). The questions are, however, distinct. Moreover, the burden to establish

standing evolves with the procedural posture. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[P]laintiffs must make a clear showing that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). Neither the individual Plaintiffs nor TDP have done so here.

**1.** Because standing is "not dispensed in gross," this Court must examine the type of harm that Plaintiffs seek to vindicate in the complaint. *Town of Chester v. Laroe Estates*, 137 S. Ct. 1645, 1650-51 (2017). Here, the gravamen of Plaintiffs' complaint is that *COVID-19* may harm them. ROA.77-82. But harms caused by a virus cannot be charged to Defendants for standing purposes because constitutional claims "require state action." *Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020) (per curiam). So the Court "cannot hold" dangers created by an act of nature or "private citizens' decisions to stay home for their own safety against the State." *Id.*; *see also Coal. For Good Governance v. Raffensperger*, No. 1:20-cv-1677-TCB, 2020 WL 2509092, *3 n.2 (N.D. Ga May 14, 2020).

The individual Plaintiffs offered no evidence that Defendants have caused their alleged injury. The only actions by the Governor or Secretary to which Plaintiffs point are steps to make in-person voting *safer* during the pandemic. *E.g.*, ROA.958. Similarly, they point only to evidence that the Attorney Generally has *not* sought to bring criminal charges under the confusing circumstances caused by Plaintiffs' litigation strategy. ROA.1778-84. Mere authority to prosecute a crime does not establish standing. *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1299-300 (11th Cir. 2019) (en banc) (applying *Okpalobi*). Because the only specific actions to which Plaintiffs point do not harm them, they cannot support standing.

**2.** The evidence offered by TDP to establish its standing fares no better, whether analyzed for associational or organizational standing.

*First*, TDP cannot show associational standing because (among other reasons) there is no "evidence in the record showing that a specific member" was injured by Defendants' challenged conduct. *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (requiring organizations to "identify members who have suffered the requisite harm"). "Member" in this context is a term of art, requiring the organization to show certain "indicia of membership." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). The person whose purported injury is alleged to support associational standing, must be among those who "elect leadership, serve as the organization's leadership, and finance the organization's activities." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012); *see also Tex. Indigenous Council v. Simpkins*, No. SA–11–cv–315–XR, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014).

To establish standing, TDP points to the injury of the three named voters and its Chairman, Gilbert Hinojosa. The individual voters lack standing for the reasons discussed above. Moreover, the only evidence regarding their supposed TDP membership is their stated intent to vote in the Democratic primary. ROA.1034, 1038, 1613. This is insufficient because it does not show that they "participate in and guide the organization's efforts," *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994), let alone that they "finance [TDP's] activities, including the costs of this lawsuit," *Hunt*, 432 U.S. at 344. Hinojosa is a member of TDP's leadership, but he is 67 years

21

old.[12] His membership cannot confer associational standing because he is not injured by actions affecting those under 65. *City of Kyle*, 626 F.3d at 237.

*Second*, TDP has not established organizational standing because it cannot satisfy the same Article III requirements applicable to individuals: injury in fact, causation, and redressability. *E.g.*, *id.* (citing *Lujan*, 504 U.S. at 560–61). The only evidence that TDP offered to show an injury directly to the organization was a declaration of Glen Maxey, its Primary Director, claiming that the Attorney General's letter to election officials "caused TDP to divert millions of dollars in resources and wholly disrupted TDP's activities," including a "robust vote-by-mail campaign[]" based on the state trial court's original order. ROA.1610-11.

A diversion of resources can represent injury in fact, but only if it specifically and "perceptibly impair[s]" an organization's activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Resources spent on the organization's "routine" activities do not suffice. *City of Kyle*, 626 F.3d at 238. So TDP had to show a "cognizable interest" that was threatened by the Attorney General's conduct and which a diversion of resources was meant "to counteract." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017). Put another way, a diversion of resources will not satisfy Article III unless Plaintiff "would have suffered" an injury to a constitutionally cognizable interest "if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores*

---

[12] *Gilberto Hinojosa & Associates: Attorney at Law*, http://ghinojosalaw.net/ghinojosalaw/home.html (last visited June 23, 2020) ("Born July 8, 1952").

*de Lake Forest v. City of Lake Fores*t, 624 F.3d 1083, 1088 (9th Cir. 2010). But a plain-

tiff "cannot manufacture standing by choosing to make expenditures based on" an

alleged harm that does not itself qualify as an injury in fact. *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 402 (2013). Absent such a cognizable interest, "any resources"

the organizational "used to counteract" the defendant's conduct "were a self-in-

flicted budgetary choice." *Elec. Privacy Info. Ctr.*, 878 F.3d at 379 (quotation omit-

ted).

Maxey's declaration does not confer organizational standing because he does

not identify any activities that "differ from the [organization's] routine . . . activi-

ties," or point to any "specific projects" TDP has "had to put on hold or otherwise

curtail in order to respond" to the Attorney General's letter. *City of Kyle*, 626 F.3d

at 238. Moreover, Texas's Supreme Court has now squarely held that the people

whom TDP sought to encourage to vote by mail were not entitled to do so. *Texas*,

2020 WL 2759629, at *11. Because the conduct that the Attorney General "wholly

disrupted" (ROA.1610) is conduct in which TDP has no cognizable right to partici-

pate, TDP's diversion of funds does not constitute an Article III injury. *Elec. Privacy*

*Info. Ctr.*, 878 F.3d at 379.

## C.  *Pullman* **required the district court to abstain.**

The district court lacked jurisdiction to enter its preliminary injunction for one

additional reason: "This was a textbook case for *Pullman* abstention." *TDP*, 961 F.3d

at at 417 (Costa, J., concurring in stay) (citing *R.R. Comm'n of Tex. v. Pullman Co.*,

312 U.S. 496, 501 (1941)). The order below reached out to decide a contested issue

of Texas law that the Texas Supreme Court would consider at oral argument literally

hours after the order below issued. That was a "threshold procedural error"; the district court had an unmistakable duty to "wait[] for an imminent interpretation of state law before determining whether that law offends the Constitution." *Id*. That alone counsels in favor of vacatur and remand for further consideration, particularly as a nonsuit with prejudice has claim-preclusive consequences under Texas law. *Epps v. Fowler*, 351 S.W.3d 862, 868-69 (Tex. 2011); *see also, e.g.*, *Spencer v. Hughes Watters Askanse, LLP*, No. 5:15-CV-00233, 2015 WL 3507117, at *4 (W.D. Tex. June 3, 2015). And state law determines the "preclusive effect of a prior state judgment in a subsequent action involving a claim within the exclusive jurisdiction of the federal courts." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 374 (1996).

## II. Plaintiffs Are Not Likely to Show a Constitutional Right to Vote by Mail.

Even if Plaintiffs could establish jurisdiction, the injunction is still improper because they have not demonstrated that Texas is abridging the rights of those under 65 to vote. The district court's muddled opinion concluded that Plaintiffs have a right to vote by mail under state law as well as the First, Fourteenth, and/or Twenty-Sixth Amendments. ROA.2066, 2123. On Plaintiffs' federal claims, the court reasoned that there was "no rational basis" for Texas to distinguish between voters under and over 65 that would survive strict scrutiny. ROA.2064. Leaving aside that the injunction conflates two very different constitutional tests, Plaintiffs' claims are subject to rational-basis review, which Texas law easily satisfies. Even if a more stringent test applies, Texas's strong interests in preserving the integrity of and confidence in its elections outweigh any burden that the *State* has placed on Plaintiffs' right to vote.

To the extent Plaintiffs assert policymakers must waive application of state law because COVID-19 is dangerous, that presents a non-justiciable political question.

### A. Texas's mail-in ballot rules easily pass the applicable rational-basis test.

Though Plaintiffs assert a right to vote by mail under three different Amendments, the assertions suffer the same fatal flaw: Under binding Supreme Court precedent, their constitutionally protected right to vote does not extend to a right to vote by mail. As a result, Texas's law is subject only to the highly deferential rational-basis test, which it easily passes. To the extent that the district court purported to apply strict scrutiny based on the Twenty-Sixth Amendment, it erred.

**1.** Plaintiffs' multifarious claims that Texas has abridged their right to vote fail because the right to vote is not at issue in this case. Instead, this case turns on "a claimed right to receive [and cast] absentee ballots." *McDonald*, 394 U.S. at 807. Texas permits—indeed encourages—Plaintiffs to vote by other means, and the Constitution does not guarantee them a right to vote by mail. *Id.*

In *McDonald*, the plaintiffs were incarcerated persons from the Chicago area who claimed a right to vote by mail because they could not "readily appear at the polls." *Id.* at 803. Like Texas, Illinois "made absentee balloting available to [only] four classes of persons," including (among others) those absent from their precinct and the disabled. *Id.* at 803-04. Because incarcerated persons were not among the limited classes, plaintiffs' applications "were refused." *Id.* at 804. Applying an equal-protection framework, the Supreme Court held that so long as the inmates had another means of voting, the "Illinois statutory scheme" would not "impact" the

inmates' "ability to exercise the fundamental right to vote." *Id.* at 807. Though it might have been easier for an inmate to vote by mail, no state action "specifically disenfranchise[d]" the plaintiffs. *Id.* at 808.

The only time that the Supreme Court has recognized a right to vote by mail is when some other state action entirely prevented the class of voters from exercising the franchise. Specifically, in *Goosby v. Osser*, 409 U.S. 512 (1973), the Court explained that "the Pennsylvania statutory scheme absolutely prohibits [incarcerated persons] from voting" by denying them absentee ballots, access to polling places in prisons, *or* transportation to a poll. *Id.* at 521-22. The Court held that this *combination* of laws unconstitutionally disenfranchised voters. *Id.*; *see also O'Brien v. Skinner*, 414 U.S. 524, 530 (1974). There is a vast difference between "a statute which ma[kes] casting a ballot easier for some who were unable to come to the polls" and a "statute absolutely prohibit[ting]" someone else "from exercising the franchise." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969).

Because Texas has not "specifically disenfranchised" Plaintiffs, its vote-by-mail rules are subject to rational-basis review. To be sure, Plaintiffs have expressed a strong preference to vote by mail due to the pandemic. ROA.1034, 1038, 1613. But the *McDonald* Court did not ask whether voters would *prefer* voting by mail. 394 U.S. at 808 n.6. Absent evidence that some state action has eliminated other means of voting, "the right to vote" was not "at stake." *Id.* at 807.

*McDonald* remains good law. As this Court noted in ruling upon Defendants' motion for a stay, "the Supreme court abrogates its cases with a bang, not a whimper,

and it has never revisited *McDonald.*" *TDP*, 961 F.3d at 405.[13] To the contrary, the Court has continued to cite *McDonald* with favor. *E.g.*, *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Bush v. Gore*, 531 U.S. 98, 143 (2000) (Ginsburg, J., dissenting). And other circuits have continued to hold that "there is no constitutional right to an absentee ballot." *Mays v. La Rose*, 951 F.3d 775, 792 (6th Cir. 2020). As a result, its rule continues to apply: "That the state accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots is an indulgence—not a constitutional imperative." *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring).

**2.** To the extent the district court applied strict scrutiny because Plaintiffs raised their claim under the Twenty-Sixth Amendment as well as the Equal Protection Clause, it erred. At heart, Plaintiffs' claims are for age discrimination, and unlike race-based distinctions, "States may discriminate on the basis of age without offending the Fourteenth Amendment, if the age classification in question is rationally related to a legitimate state interest." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83-84 (2000). And the language, history, and the few cases interpreting the Twenty-Sixth Amendment all confirm that it leaves *McDonald*'s mail-in-ballot rule intact.

---

[13] As Plaintiffs conceded in the Supreme Court, the stay-panel decision in this case is published, and therefore its analysis of *McDonald* is "precedential." Reply to Respondents' Opposition to the Application to Vacate the Fifth Circuit Stay at 10, *Tex. Democratic Party v. Abbott*, No. 19A1055, 2020 WL 3478784 (U.S. June 26, 2020). That is why Plaintiffs admitted to the Supreme Court that it is "unlikely" they "*could* prevail in any further proceedings before the Fifth Circuit." *Id.*

The Twenty-Sixth Amendment provides: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged . . . on account of age." U.S. Const. amend. XXVI. The Amendment does not define the term "right to vote," but it "must be interpreted by reference to historical practices and understandings" at the time of ratification. *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) (quotation marks omitted). This includes other times the same term is used in the Constitution and "the effect attributed to them before the amendment was adopted." *Eisner v. Macomber*, 252 U.S. 189, 205 (1920); *Brushaber v. Union Pac. R.R.*, 240 U.S. 1, 18 (1916); *accord Dep't of Homeland Sec. v. Thuraissigiam*, No. 19-161, 2020 WL 3454809, at *7 (U.S. June 25, 2020) (applying Suspension Clause as understood by courts at time of ratification). *McDonald* is particularly instructive in interpreting the Twenty-Sixth Amendment because it was decided little more than two years before the amendment was ratified. As "the Amendment contains nothing repudiat[ing] or challenging" *McDonald*, "the Amendment at least impliedly" ratifies that ruling and makes it part of the Constitution. *Brushaber*, 240 U.S. at 19; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322-26 (2012) (describing the prior-construction canon).

Proposed and ratified in 1971, during the height of the Vietnam War, the Amendment's history confirms that it reflected an effort to extend the right to vote as it was then understood to individuals between the ages of 18 and 21—not, as Plaintiffs suggest, to eliminate all age-based distinctions in any election-related regulations. Eric S. Fish, Note, *The Twenty-Sixth Amendment Enforcement Power*, 121 Yale L.J. 1168, 1184-95 (2012). Moreover, that history reflects that mail-in voting was to be *avoided*

because the "special burdens" that it imposes on voters "might well serve to dissuade" young people from voting. S. Rep. No. 92-26 at 14 (1971).

The limited effect of the Amendment has also been recognized by the few courts who have interpreted it. For example, *Meyers v. Roberts* held that the Twenty-Sixth Amendment "on its face applies only to the right to vote" and says nothing about related rights, such as the right to hold office. 246 N.W.2d 186, 189 (Minn. 1976); *see also Spencer v. Bd. of Educ. of Schenectady*, 291 N.E.2d 585, 585 (N.Y. 1972). *Nashville Student Organizing Committee v. Hargett* rejected a challenge to a voter identification law because even if younger voters were less likely to have an acceptable form of ID, the law "is not an abridgment of the right to vote." 155 F. Supp.3d 749, 757 (M.D. Tenn. 2015). As the court explained, "the handful of cases" finding a violation of the Twenty-Sixth Amendment "have involved state action that actually blocked young people from voting rather than simply exclud[ing] measures that would make it easier for them to do so." *Id.* at 757-58.

The case upon which the district court relied, *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979), is one such case. There, a local county clerk—in open defiance of Texas's Secretary of State, *id.* at 1246—refused to allow college students to register to vote because they were not, in his view, bona fide residents of the county, *id.* at 1260. As

a result, of more than 1,000 students who applied, all but 27 were entirely disenfranchised, particularly as to local elections. *Id.* at 1249.[14]

Defendants have not disenfranchised Plaintiffs. To the contrary, they are acting to ensure that voting in person—as Texas's Legislature has required—is safe. *Supra* at 5-7. As a result, Texas's mail-in-ballot rules do not implicate the right to vote and are subject only to rational-basis review.

**3.** Texas's decision to facilitate voting by those over 65, which is common among the States, is "rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). "[R]ational basis review . . . is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319 (1993) (quotation marks omitted). Moreover, the burden is not on Texas to prove the law valid but "on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012) (quotation marks omitted). Plaintiffs have not met this burden.

Texas's distinction between voters aged under and over 65 is rational. Even outside the context of COVID-19, individuals over 65 (as a group) face greater challenges in attending the polls. For example, many reside in nursing homes and have

---

[14] *See also Jolicoeur v. Mihaly*, 488 P.2d 1, 7 (Cal. 1971) (rejecting registration rule that prevented voters aged 18 to 21 from voting in local elections); *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 221 (Colo. 1972) (rule limiting initiative process to those over 21); *accord Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364, 1365 (1st Cir. 1975) (rejecting scheduling decision that disenfranchised college students).

limited mobility.[15] Though others may also have difficulties reaching the polls, the line need not be "perfectly tailored to that end," so long as the distinction is not arbitrary. *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1782 (2019). Texas's Legislature may "take one step at a time, addressing itself to the phase of the problem which seems most acute." *F.C.C. v. Beach Commc'ns Inc.*, 508 U.S. 307, 316 (1993); *see also Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 108 (2003).

Texas's conclusion that the problems facing older voters are unique is neither novel nor new. Many States allow citizens to vote by mail, but it is "common" for States that limit vote-by-mail to certain citizens "to provide this option to elderly voters."[16] Every State in this Circuit does so,[17] and many others do, too.[18] Moreover, these statutes are not new. Texas amended its in 1975 law to allow those over 65 to vote by mail in the *same bill* that extended the right to vote to those from 18 to 21. *Supra* at 3-4. That this law was passed immediately after the Twenty-Sixth Amendment is strong evidence that the law was understood to be consistent with that amendment. *See Town of Greece*, 572 U.S. at 576; *Atwater v. Lago Vista*, 532 U.S. 318,

---

[15] *See* Texas Health and Human Services, *Long Term Care*, https://hhs.texas.gov/services/aging/long-term-care.

[16] National Conference of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail, and Other Voting at Home Options, Qualifying for an Absentee Ballot* (June 9, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

[17] Tex. Elec. Code § 82.003; La. Stat. § 18:1303(J); Miss. Code § 23-1415-715(b).

[18] *E.g.*, Ind. Code § 3-11-10-24(a)(5); Ky. Rev. Stat § 117.085(a)(8); Tenn. Code § 2-6-201(5)(A).

337-40 (2001); *cf. Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv. LLC*, 140 S. Ct. 1649, 1659 (2020). That laws allowing the elderly to vote by mail have existed across multiple States without challenge for 45 years indicates that they are at least rational.

Indeed, though the impact of COVID-19 could not have been anticipated in 1975, the extension of mail-in voting to those over 65 has proven particularly prescient here. Though the parties dispute the risk of transmission if voters go to the polls, no one disputes that those over 65 face the greatest risk of serious complications should they contract the virus. ROA.568-70, 1602-03. It is thus entirely rational to allow these higher-risk individuals to exercise the franchise at home.

It was improper for the district court to hold otherwise based on speculation that Texas officials are actually trying to disenfranchise "a sector of the population because of the way [it] may vote." ROA.2125. The record is silent on what motivated a Democratic-majority Legislature to adopt this policy in 1975, what led a Democratic-majority Legislature retain it in the 1985 recodification of the Election Code, or what has caused Legislatures led by both parties to maintain it ever since.[19] More fundamentally, what "reasoning in fact underlay the legislative decision" is "constitutionally irrelevant" under rational-basis review. *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980); *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992).

---

[19] *Party Affiliation on the First Day of the Legislative Session*, Legislative Reference Library of Texas, https://lrl.texas.gov/legeLeaders/members/partyList.cfm (last visited June 25, 2020).

## B.  Plaintiffs' claim fails even under the *Anderson/Burdick* test.

Even if the Court were to conclude that the stricter *Anderson/Burdick* test applies, Plaintiffs are not likely to prevail. Because "[e]very decision that a State makes in regulating an election will, inevitably, result in somewhat more inconvenience for some voters than for others," the Supreme Court has developed a balancing test for claims related to the franchise. *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016). Under this standard, the Court must first identify the relevant state action, and then "weigh 'the character and magnitude of the asserted injury'" to Plaintiffs' constitutionally protected right "against 'the precise interests put forward by the State as justifications for the burden imposed.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). State actions that impose a "severe" burden on the right to vote are closely scrutinized. *Id.* "Lesser burdens, however, trigger less exacting review." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Courts are careful when identifying the nature of the state action because "[t]o deem ordinary and widespread burdens severe would be to subject virtually every electoral regulation to strict scrutiny"—an outcome "the Constitution does not require." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005).

The specific state action here is unclear because Plaintiffs assert an as-applied challenge based on unspecified "Election Conditions." ROA.31. Only deliberate governmental action can form the basis of a constitutional claim. Michael T. Morley, *Election Emergencies: Voting in the Wake of Natural Disasters and Terrorist Attacks*, 67 Emory L.J. 545, 589 & nn. 315, 320-24 (2018) (collecting cases). If the challenged "Election Conditions" are the existence of the virus, Plaintiffs have alleged no state

action. If the Conditions are allegedly insufficient precautions to protect against COVID-19, Plaintiffs have presented a nonjusticiable political question. And if they are Texas's law requiring most voters to vote in person, any restriction is justified by the State's "compelling interest in preserving the integrity of its election process." *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989).

**1.** The district court's failure to identify a specific government action that supposedly abridges Plaintiffs' right to vote obscures that "[t]he real problem here is COVID-19, which all but the craziest conspiracy theorists would concede is not the result of any act or failure to act by the Government." *Raffensperger*, 2020 WL 2509092, at *3 n.2. To the extent that the "Election Conditions" challenged in Plaintiffs' complaint are simply the dangers posed by COVID-19, the claim fails because a virus cannot violate the Constitution. *See, e.g.*, U.S. Const. amend. I ("Congress shall make no law. . . ."); *Roberts v. La. Downs, Inc.*, 742 F.2d 221, 224 (5th Cir. 1984) (summarizing state-action requirement).

**2.** To the extent that the "Election Conditions" are based on "[s]ubjective risk assessments concerning the need" to change the rules of an election to protect voters against that virus, the complaint presents a "quintessentially political question[]" which the judiciary may not second guess. *Morley*, *supra*, at 598-99. At its core, the political-question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution" to a coordinate branch of the federal government, *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 949 (5th Cir. 2011) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)), or the States, *Rucho v.*

*Common Cause*, 139 S. Ct. 2484, 2501 (2019). *Baker v. Carr*, 369 U.S. 186, 217 (1962), provided six factors, "any one" of which "is sufficient to indicate the presence of a non-justiciable political question." *Spectrum Stores*, 632 F.3d at 949. At least four exist here.

*First*, there is a "textually demonstrable constitutional commitment" of the decision to another government actor. *Baker*, 369 U.S. at 217. Under the Elections Clause, state legislatures regulate elections. U.S. Const. art. I, § 4, cl. 1. "Whether to give that supervisory authority to the National Government was debated at the Constitutional Convention," and it was rejected. *Rucho*, 139 S. Ct. at 2495 (quoting 2 *Records of the Federal Convention of 1787* 240-41 (M. Farrand, ed., 1966)).

*Second*, there is an "unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217. Indeed, the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm.*, 140 S. Ct. at 1207 (collecting cases). Precipitous changes to the rules can cause "confusion" and even undermine public confidence in the outcome of the election itself. *Purcell*, 549 U.S. at 4-5.

*Third*, the district court could not reach its conclusion "without expressing lack of respect" to other governmental actors. *Baker*, 369 U.S. at 217. Indeed, it is hard to imagine a more disrespectful statement than to suggest that Texas's Executive Branch has demonstrated that it "value[s]" partisan advantage over the lives of the majority of its population, ROA.2064, simply by applying a law adopted and maintained by legislatures of both parties for nearly 50 years.

35

*Fourth*, and most importantly, there is no "judicially discoverable and manageable standard[]" for when a public-health emergency requires a State to change from a predominately in-person voting model to an entirely vote-by-mail election system. *Baker*, 369 U.S. 217. Before finding a nonjusticiable political question, courts may look for guidance to "statutory, administrative, or case law." *Lane v. Halliburton*, 529 F.3d 548, 562 (5th Cir. 2008). But the standard they announce must be "grounded in a 'limited and precise rationale,'" and must be "'clear, manageable, and politically neutral.'" *Rucho*, 139 S. Ct. at 2498 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 306 (2004) (Kennedy, J., concurring)). Where the case turns on "a political rather than a legal standard," federal courts may not venture. *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 388 (3d Cir. 2006) (collecting cases).

Acceptable forms of guidance are entirely absent here. As Plaintiffs' counsel has admitted elsewhere, this case is "first-of-its-kind." Dunn, *supra*, at 167. And the district court did not purport to describe a "discernable and manageable standard" by which a court could distinguish when a State has taken "enough" safety measures to protect voters against a particular virus, from when the Constitution demands an all-mail-in ballot system. *Raffensperger*, 2020 WL 2509092, at *3 (citing *Jacobson*, 957 F.3d at 1213 (Pryor J., concurring)).

And such a standard is not feasible because it would require a federal court to make both a medical determination about the risk associated with an illness and a political one about how to balance that risk against the profound consequences of shifting entirely to mail-in ballots. Mail-in voting is a "complex procedure," with unique logistical challenges that cannot be addressed "at the last minute." *Veasey*,

830 F.3d at 255. For example, because Texas is a diverse State where many languages are spoken, ROA.795, ballots either need to be printed in multiple languages or assistance provided in such a way that the nominal helper does not impose his own views on the voter. Tex. Elec. Code ch. 64, subch. B. Texas is also home to a mobile society, so election officials must ensure that the correct ballot is sent to the correct address.[20] And since no one is checking the voter's ID, safeguards must be put in place to ensure that the person who fills out the ballot is the registered voter. Tex. Elec. Code ch. 87. If a State fails to adequately address these risks—a likely result of changes made on the fly—the result could "drive[] honest citizens out of the democratic process and breed[] distrust of our government." *Purcell*, 549 U.S. at 4.

By limiting mail-in ballots to those who likely need—as opposed to want—them, the Legislature has limited these difficulties to where they are most justified. The district court disregarded that balance based on naked policy disagreement about how to address unspecified "Election Conditions" during a pandemic. ROA.2063. Because subjective disagreement is not a legal standard, this was improper. *Rucho*, 139 S. Ct. at 2498 (describing "especially clear standards" as "vital in such circumstances").

**3.** To the extent that the "Election Conditions" include adherence to the Texas Legislature's choice not to provide for universal mail-in balloting, *Anderson/Burdick* allows that too. As the Supreme Court has explained, the "risk of voter fraud is real,"

---

[20] *David Wildstein*, Evidence of Massive Voter Fraud in Paterson Election, Court Records Show, N.J. Globe (June 14, 2020), https://newjerseyglobe.com/local/evidence-of-massive-voter-fraud-in-paterson-election-court-records-show/.

and it "could affect the outcome of a close election." *Crawford*, 553 U.S. at 195-96; *accord Bush*, 531 U.S. at 100 (per curiam) (addressing election challenge over approximately 200 votes). Thus, "[w]hile the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford*, 553 U.S. at 196. Moreover, courts around the country—including this one—have recognized that "the potential and reality of [voter] fraud is much greater in the mail-in-ballot context than with in-person voting." *Veasey*, 830 F.3d at 239; *id.* at 306 n.46 (Jones, J., concurring in part and dissenting in part); *Purcell*, 549 U.S. at 4; *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2009); *cf. Crawford*, 553 U.S. at 225 (Souter, J., dissenting) ("absentee-ballot fraud . . . is a documented problem").

The district court received evidence that mail-in ballot fraud is a "serious problem," ROA.781, because vote harvesting is "very easy" without the safeguards that accompany in-person voting, ROA.782. Indeed, Plaintiffs' own expert, George Korbel, has testified elsewhere about the seriousness of the problem and its potential impact on an election. *See O'Caña v. Salinas*, No. 13-18-00563-CV, 2019 WL 1414021, at *1-2 (Tex. App.—Corpus Christi-Edinburg Mar. 29, 2019, pet. denied) (mem. op.). Nevertheless, the district court rejected this rationale due to what *it* deemed an unacceptable risk from COVID-19 and a failure by the State to account for the risk of fraud in allowing older voters to vote by mail. ROA.2124-25. This decision was wrong on the merits and on the remedy.

On the merits, the district court's ruling was improper because it failed to consider the significant steps that Texas policymakers have taken to protect in-person voting. Because under *Anderson/Burdick*, the district court must decide whether the

state's actions are "necessary to burden the plaintiff's rights," the court should have weighed these steps, including evidence that similar steps had been successful in controlling the spread of COVID-19 in Wisconsin, as well as any salient features of the COVID-19 pandemic in Texas bearing on Plaintiffs' claims. *Burdick*, 504 U.S. at 434. For example, when the district court ruled, "35 counties [in Texas] ha[d] no reported cases, 57 counties ha[d] fewer than 5 reported cases and on[ly] 44 ha[d] more than 100 cases." ROA.570.[21] It abused its discretion in ignoring these relevant factors. *See In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (orig. proceeding) (per curiam).

The district court's remedy was also wrong. The court concluded that the Constitution requires equality in access to mail-in ballots based on age. But "[h]ow equality is accomplished . . . is a matter on which the Constitution is silent." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017). That silence must be filled by the political branches. *Olsen v. DEA*, 878 F.2d 1458, 1464 (D.C. Cir. 1989) (Ginsburg, J.). Texas's political branches have consistently chosen to allow voting by mail only as a limited exception to the general rule of in-person voting. *Texas*, 2020 WL 2759629, at *8. When an exception creates a constitutional problem, the exception yields to the general rule, not the general rule to the exception. *See Morales-Santana*, 137 S. Ct. at 1698-1701. The district court therefore should have eliminated the supposedly

---

[21] Though the number of COVID-19 cases in Texas has increased since the district court's ruling, they remain concentrated in a few metropolitan areas. *Texas Coronavirus Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/texas-coronavirus-cases.html (last updated June 26, 2020).

unconstitutional exception to allow those over 65 to vote by mail, not expanded it such that it swallows Texas's long-established presumption in favor of in-person voting. *Morales-Santana*, 137 S. Ct. at 1698; *TDP*, 961 F.3d at 417 (Ho, J., concurring in stay) ("If Plaintiffs have a legal theory to justify a 'leveling-up' injunction, they did not offer one here. Nor did the district court.").

### III. The Texas Supreme Court Has Now Confirmed that Plaintiffs Cannot Succeed on their Remaining Claims.

The Court should also vacate the remainder of the injunction because Plaintiffs will not succeed on their remaining claims that: (1) Texas's definition of "disability" for vote-by-mail purposes is void for vagueness, (2) the Attorney General's guidance about the meaning of "disability" was voter intimidation, or (3) this guidance abridged Plaintiffs' free-speech rights.

### A. Plaintiffs will not succeed on their void-for-vagueness claim.

Applying the standard used in criminal cases, the district court concluded that Texas's definition of "disability" is unconstitutionally vague because the Attorney General's letters contain a definition of "disability" that conflicts with the "one from the Texas judiciary." ROA.2120. As a result, the district court found, "people of ordinary intelligence" lacked "a reasonable opportunity to understand if they are qualified to access a mail ballot." ROA.2120. This reasoning was wrong when it was issued, and the Texas Supreme Court has since resolved any perceived conflict.

**1.** Texas's definition of "disability" was never unconstitutionally vague. As an initial matter, the district court erred by applying a test ordinarily used when the void-for-vagueness doctrine is raised as a defense in a criminal proceeding. *Kollender*

*v. Lawson*, 461 U.S. 352, 357 (1983). That test applies to a civil statute only when it "is quasi-criminal," *and* a plaintiff claims that it is "impermissibly vague in all of its applications." *United States v. Clinical Leasing Servs., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991). Assuming section 82.002 meets the first prong (which it does not), Plaintiffs are seeking preliminary relief on an as-applied challenge. ROA.94. Thus, a court can refuse to apply section 82.002 only if it is "so vague and indefinite as really to be no rule at all." *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1212-13 (2018) (plurality op.). Plaintiffs have never claimed that section 82.002 meets this standard. Instead, they claimed— and the district court agreed—that a plain reading of the text supported their view. ROA.120; *see* ROA.2064.

The statute did not become "vague and indefinite," *Groome Resources*, 234 F.3d at 217, because the Attorney General issued guidance regarding a stayed trial-court ruling. A "statute is not unconstitutionally vague merely because" there is "uncertainty about its application to the facts of [a] case." *Ford Motor Co. v. Tex. DOT*, 264 F.3d 493, 509 (5th Cir. 2001); *Stansberg v. Holmes*, 613 F.3d 1285, 1289 (5th Cir. 1989). Courts exist, in part, because all laws "are considered as more or less equivocal" until ruled upon in litigation. The Federalist No. 37, at 225 (James Madison) (Clinton Rossiter, ed., 1961). If a statute were unconstitutionally vague simply because "two lawyers may read [it] differently," *no* statute would pass constitutional muster. *Nautilus Ins. Co. v. Int'l House of Pancakes, Inc.*, 622 F. Supp. 2d 470, 481 (S.D. Tex. 2009). Instead, the Constitution is satisfied so long as the "core of prohibited activity is defined." *Ford Motor Co.*, 264 F.3d at 509. Section 82.002 has

always met that standard, regardless of the Attorney General's disagreement with the state trial court about particular applications.

**2.** Furthermore, the supposed contradiction that troubled the district court has now been resolved. In assessing whether a state statute is unconstitutionally vague, a federal court must consider any binding construction by that State's high court. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991). Texas's Supreme Court has now "agree[d] with the State" that lack of immunity to COVID-19 is not a disability as the Legislature defined that term. *Texas*, 2020 WL 2759629, at *1.

## B. Plaintiffs will not succeed in showing the Texas Attorney General engaged in voter intimidation.

The district court also erred when it held that Plaintiffs would likely prove voter intimidation under 52 U.S.C. § 10307(b) and conspiracy to commit the same under 42 U.S.C. § 1985(3). These claims also turn on the Attorney General's guidance about the meaning of "disability," which has now been vindicated by the Texas Supreme Court. ROA.2121-22. Both claims fail.

**1. Section 1985(3)**. To state a claim under section 1985(3), a plaintiff must allege: "(1) a conspiracy involving two or more persons; (2) for the purpose of depriving" plaintiffs "of the equal protection of the laws"; and (3) an act in furtherance of the conspiracy; (4) "which causes injury" to plaintiffs' rights or privileges as citizens of the United States. *Hilliard v. Ferguson*, 30 F.3d 649, 652-53 (5th Cir. 1994). Moreover, in this circuit, only conspiracies that are motivated by racial animus are cognizable under section 1985(3). *Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019)

(citing *Deubert v. Gulf Stream Fed. Sav. Bank*, 820 F.2d 757, 757 (5th Cir. 1987)). Plaintiffs do not meet this standard for at least three reasons.

*First*, Plaintiffs have not alleged a conspiracy between two persons. As an initial matter, the district court improperly extended its holding to "defendants." ROA.2122. Plaintiffs have neither alleged nor shown evidence, that the Governor or Secretary was involved in formulating the Attorney General's letter. Instead, Plaintiffs assert only that "General Paxton has worked in concert with employees." ROA.124. Texas's Governor and Secretary of State are not employees of its Attorney General. Moreover, "[i]t is a long-standing rule in this circuit . . . that the acts of the agent are the acts of the [principal.]" *Hilliard*, 30 F.3d at 653. Thus, any letter written by an agent of the Attorney General in the course of his agency is an *act of* the Attorney General, not a *conspiracy with* him. *Cf. Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir. 1998) (discussing limits of doctrine).

*Second*, Plaintiffs cannot show the letter was sent with the intent to deprive anyone of the right to vote. One function of the Attorney General under Texas law is to issue guidance about the meaning of state law when requested by specified individuals. Tex. Gov't Code §§ 402.042-.043. General Paxton's guidance was consistent with that obligation. ROA.857-59, 1923-24. Far from threatening anyone, his guidance simply laid out his view of who is entitled to vote by mail under state law and potential consequences for failure to comply with the law. ROA.857-59. The views expressed in these letters have now been entirely vindicated by the Texas Supreme Court, and they cannot reflect any intent to intimidate voters from engaging in a lawful activity.

*Third*, the district court did not find—because Plaintiffs did not argue—that the supposed conspiracy was motivated by race-based animus. ROA.2153-54. This alone is fatal. *Cantu*, 933 F.3d at 419.

2. **Section 10307(b):** Nor do these letters sustain a claim under section 10307(b). As an initial matter, there is no private right of action under this provision for two reasons. *First*, section 10307(b) provides that's "no person . . . shall intimidate" any voter from voting. "Statutes [like section 10307(b)] that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (quotation marks omitted). That is, the provision "is framed in terms of the obligations imposed on the regulated party," and voters are "referenced only as an object of that obligation." *Logan v. U.S. Bank N.A.*, 722 F.3d 1163, 1171 (9th Cir. 2013). Such statutes do not create a private right of action because they do not confer rights on Plaintiffs "in clear and unambiguous terms." *Delancey v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009).

*Second*, the U.S. Attorney General may bring a civil action to enjoin violations of section 10307(b), but Congress did not extend similar power to private litigants. 52 U.S.C. § 10308(d). "The express provision of one method of enforcing a substantive rule suggests that Congress intend to preclude others." *Sandoval*, 532 U.S. at 290. "Because "the statute does not itself" create "a private cause of action," one should "not be created through judicial mandate." *Ziglar v. Abassi*, 131 S. Ct. 1843, 1856 (2017).

Moreover, even if such a cause of action existed, Plaintiffs have not stated a plausible claim. A violation of section 10307(b) requires (1) an act of intimidation, and (2) that the act was done with specific intent to intimidate someone not to vote. *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967); *Willingham v. Cty. of Albany*, No. 04-369, 2005 WL 1660114, at *7 (N.D.N.Y. July 12, 2005). Plaintiffs cannot establish that the Attorney General intended to intimidate voters because he did not; he simply explained the requirements state law in response to "public confusion." ROA.857. To read "intimidation" that broadly would extend it far beyond the reach ever assigned by Congress. *See McLeod*, 385 F.2d at 740.

## C.  Plaintiffs will not succeed on their free-speech claims.

Plaintiffs also cannot establish that the Attorney General's letters unlawfully prevented them from "engaging in [protected] communications with voters about who is eligible to and how to vote by mail." ROA.2117-18. The district court's ruling on this claim suffers from three flaws.

*First*, the court's suggestion (at ROA.2117) that the Attorney General discriminated between Republicans and Democrats is belied by the record. His guidance was sent to all election officials in the State regardless of political affiliation. ROA.857-59. Plaintiffs offered evidence that the Attorney General has not prosecuted a Republican campaign for encouraging ineligible people to vote by mail. ROA.1778-84. But Plaintiffs did not offer evidence that he investigated, much less prosecuted, a similarly situated Democratic campaign. There is thus no evidence of unequal treatment.

*Second*, the First Amendment does not protect Plaintiffs' asserted right to encourage people ineligible to vote by mail under state law to nevertheless cast a mail-in ballot. Offers, solicitations, and incitement "to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297; *see also, e.g.*, *Cox v. Louisiana*, 379 U.S. 559, 563 (1965) (citing *Fox v. Washington*, 236 U.S. 273, 277-78 (1915)). "The illegality in this case may be less overt" than where that rule is usually applied, but there is "no difference in principle here." *Pittsburg Press Co. v. Pittsburg Comm'n on Human Relations*, 413 U.S. 376, 388 (1973). The Texas Supreme Court has now confirmed that the targets of Plaintiffs' proposed communications are ineligible to vote by mail. Because Texas law makes it a crime to knowingly submit false mail-in ballot applications (or to encourage others to do so), Tex. Elec. Code §§ 84.0041, 276.013, Plaintiffs' First Amendment rights were not implicated.

*Third*, by contrast, the district court's order did implicate General Paxton's rights. The freedom of speech safeguards the rights of individuals to "speak as they think on matters vital to them," relying on "processes of education and discussion" to root out falsehood. *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). It protects that right for public officials as well as private individuals. *Bond v. Floyd*, 385 U.S. 116, 133-35 (1966). The district court violated that principle by purporting to enjoin Texas's Attorney General from giving accurate advice regarding the content of state law that was not tied to any tangible enforcement action. *Cf. Colson v. Grohman*, 174 F.3d 498, 513 (5th Cir. 1999) (rejecting claim based on "retaliatory criticisms, investigations, and false accusations" alone).

## IV. The Remaining Preliminary-Injunction Factors Favor Defendants.

The district court further abused its discretion in concluding that the remaining preliminary injunction factors favored Plaintiffs. *First*, Plaintiffs have not shown that they will suffer irreparable harm "in the absence" of a preliminary injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22-23 (2008). This analysis required the district court to consider Plaintiffs' alleged harm "in light of" the numerous steps the State has taken to make in-person voting safe. *Id.* It did not do so. ROA.2125-26. The district court's complete failure to consider relevant factors is an abuse of discretion. *Volkswagen*, 371 F.3d at 203.

*Second*, the injunction irreparably harms Defendants. In addition to the harm that the injunction inflicts on General Paxton's free-speech rights, the injunction inflicts an "institutional injury" from "the inversion of . . . federalism principles." *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). "[A]ny time a State is enjoined . . . from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 122 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers); *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991). The district court improperly disregarded that injury. ROA.2126.

*Finally*, "[b]ecause the State is the appealing party, its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). That principle applies with particular force here because it is well established that States must be allowed to enact clear and uniform laws to ensure "fair and honest" elections, to bring "order, rather than chaos" to "the democratic process," and

ultimately to allow the right to vote to be fully realized. *Storer v. Brown*, 415 U.S. 724, 730 (1974). That is why the Supreme Court has repeatedly cautioned federal courts *not* to interfere on the eve of state elections, lest they create "voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4-5.

## Conclusion

The Court should reverse the decision below, vacate the preliminary injunction, and remand with instructions to dismiss Plaintiffs' complaint.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Ryan L. Bangert
Deputy First Assistant
   Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Kyle D. Hawkins
Kyle D. Hawkins
Solicitor General
kyle.hawkins@oag.texas.gov

Lanora C. Pettit
Assistant Solicitor General

Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

On June 29, 2020, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kyle D. Hawkins
KYLE D. HAWKINS

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,992 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kyle D. Hawkins
KYLE D. HAWKINS